UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ST. PAUL FIRE & MARINE INSURANCE CO.,<br><br>                              Plaintiff,<br><br>          -against-<br><br>ASEGURADORA DE CREDITOS Y GARANTIAS, S.A.,<br><br>                              Defendant. | 12-cv-4627 (LAK) (MHD)<br><br>**COMPLAINT** |

Plaintiff, St. Paul Fire & Marine Insurance Company ("St. Paul"), by its attorneys, Chadbourne & Parke LLP, for its complaint against defendant, Aseguradora de Creditos y Garantias, S.A. ("ACG"), alleges:

### Nature of the Proceeding

1. This action seeks a judgment declaring that St. Paul did not extend Facultative Certificate 1551500 (the "Certificate") beyond September 16, 2003 or, in the alternative, rescinding any extension covering the period September 16, 2003 to December 16, 2003 (or later) on the grounds that at the time of seeking an extension beyond September 16, 2003, ACG failed to disclose to St. Paul material information concerning the nature of the reinsurance risk. In the event the court were to conclude both that the Certificate was extended beyond September 16, 2003 and that the post-September 16, 2003 extension is valid, St. Paul may seek a declaration that it has no liability for any losses ceded to the Certificate because: (i) the date of loss falls outside the reinsured period; and (ii) ACG failed to retain net and unreinsured 17.55% of the underlying risk, as ACG represented it would do.

2. Reinsurance is the contractual transfer of risk from a direct insurer (the "cedent") to another insurer (the "reinsurer") whereby the reinsurer (here, St. Paul) "assumes" from the

cedent (here, ACG) all or a portion of the risk that the cedent bears under one or more policies of insurance. A reinsurance "treaty" is a contract that applies to a book or class of ceded insurance risks; facultative reinsurance is a contract that generally applies to a single, specified insurance policy.

## The Parties

3. St. Paul is a property and liability insurer that is organized under the laws of the State of Minnesota. St. Paul maintains its principal place of business in Saint Paul, Minnesota. At all times relevant to this complaint, St. Paul conducted its assumed reinsurance operations through St. Paul Re, a management company, whose principal offices were (and today remain) in New York, New York. St. Paul operates as a subsidiary of The Travelers Companies, Inc., a publicly traded company.

4. ACG is an insurance company organized under the laws of the Republic of Argentina, which maintains its principal place of business in the Autonomous City of Buenos Aires, Republic of Argentina.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332; the citizenship of the parties is diverse and the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs.

6. This Court may exercise personal jurisdiction over ACG pursuant to CPLR 302; ACG has transacted business within the State of New York (including an April 2012 meeting to discuss the Certificate) and, in addition, ACG may have committed a tortious act causing injury within the State.

7. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) & (c); a substantial part of the events giving rise to the claim occurred in this district; further, as noted

immediately above, ACG is subject to this Court's personal jurisdiction with respect to this civil action.

## Background

8.  In or about September 1997, ACG, acting through S.B. Walbaum Americana S.A. ("Walbaum"), a reinsurance intermediary, asked St. Paul whether St. Paul would facultatively reinsure a performance bond issued by ACG to Correo Argentino S.A. ("Correo"); Correo was obligated to post a performance bond in favor of the Argentinean government as part of a concession Correo had obtained to operate the Argentinean public mail system.

9.  On September 26, 1997, St. Paul advised ACG (via a facsimile transmission addressed to Walbaum, ACG's agent) that St. Paul was prepared to participate as a facultative reinsurer of the Correo performance bond, ACG policy 522.725 (the "Bond"), to a maximum line not to exceed $5 million and a maximum term not to exceed three (3) years. St. Paul reserved the right to renew its participation as a Bond reinsurer beyond three years, provided ACG provided St. Paul annual financial statements for the Correo postal concession and other underwriting information.

10. ACG accepted the facultative reinsurance terms offered by St. Paul.

11. On or about November 26, 1997, Walbaum issued a reinsurance cover note to ACG indicating that St. Paul was one of three facultative reinsurers that collectively had assumed a 30.42% participation (13.000,000 Argentinean pesos part of 42.735,000 Argentinean pesos) on the Bond. The cover note recited that St. Paul's signed line was 11.7% (38.462% of 30.42%). The cover note also provided that the term of the reinsurance was September 16, 1997 through September 16, 2000, which three year term was automatically renewable for successive three year periods "at [each] reinsurer's sole discretion." The cover note obligated ACG to

"forward annually to the reinsurers an economic-financial up-date on the parties under the contract of guarantee."

12. On or about November 26, 1997, Walbaum asked St. Paul to sign a reinsurance slip which included each of the contractual terms set forth in the cover note delivered by Walbaum to ACG. St. Paul received, and subsequently signed, the slip in New York.

13. On or about June 23, 1998, St. Paul issued the Certificate, further documenting its participation as a reinsurer of ACG on the Bond. The Certificate, like the reinsurance cover note and reinsurance slip, had an express three year term, to wit, September 16, 1997 to September 16, 2000.

14. The Certificate, slip and cover note all expired on September 16, 2000 without ACG asking St. Paul to renew its reinsurance participation and without St. Paul offering (or agreeing) to renew its reinsurance participation.

15. Upon information and belief, at some point in or about 2001, Benfield Argentina S.A. ("Benfield"), which had acquired Walbaum in 1998, asked St. Paul on ACG's behalf (or ACG directly asked St. Paul) to renew the Certificate's term retroactively for an additional three year period -- from September 16, 2000 to September 16, 2003.

16. On or about February 17, 2004 (and, perhaps, earlier still), ACG (acting through Benfield) asked St. Paul to extend the Certificate a second time (again retroactively) from September 16, 2003 through December 16, 2003 (the "Second Extension").

17. In connection with each of its two requests to extend the term of the Certificate, ACG was required to disclose to St. Paul all facts which might be material to a prudent reinsurance underwriter's decision whether, and on what terms, to extend reinsurance cover.

18. On March 15, 2004, St. Paul declined ACG's request for a Second Extension.

19. St. Paul later learned that the underwriting information provided by ACG in connection with ACG's second request to extend the Certificate was incomplete and that ACG failed to disclose several material facts to St. Paul; St. Paul now knows that on or about November 20, 2003, the Argentinean government rescinded the postal concession that had been awarded to Correo in 1997 and contemporaneously directed the Secretary of Communications of the Ministry of Planning and Public Investment Services to proceed with the execution of any collateral. ACG was aware of these facts. Neither of these facts -- each of which predates ACG's March 15, 2004 request for the Second Extension and each of which a prudent reinsurance underwriter would find material -- was disclosed to St. Paul in connection with ACG's request for the Second Extension.

20. The undisclosed facts identified in Paragraph 19, alone and/or collectively, would have been material to St. Paul's decisions whether, and on what basis, to provide a Second Extension.

21. If ACG had disclosed all material underwriting information to St. Paul in March 2004, St. Paul would not have agreed to extend the Certificate beyond September 16, 2003.

22. St. Paul's potential exposure to loss under the Certificate's Second Extension (assuming *arguendo* there was a Second Extension) is $4,999,995 Argentinean pesos, a sum that exceeds this Court's jurisdictional amount even following Argentina's currency devaluation.

## COUNT I
### (Declaratory Judgment)

23. St. Paul repeats and realleges here, as if set forth at length, paragraphs 1 through 22 of this Complaint.

24. In or about April 2012, ACG wrote to St. Paul asking St. Paul to acknowledge that the Certificate provides coverage for losses irrespective of whether a loss occurs on or

5

before September 16, 2003. In other words, ACG contends that the term of the Certificate extends beyond September 16, 2003 and includes the period of the Second Extension.

25. St. Paul, which can find no written documentation in its files indicating that St. Paul agreed to extend the term of the Certificate beyond September 16, 2003, asked ACG to provide St. Paul any documentation ACG might have indicating that St. Paul agreed to the Second Extension; ACG has provided nothing probative.

26. There currently exists an actual and justicable controversy between St. Paul and ACG; the parties disagree as to whether the coverage provided by the Certificate continues beyond September 16, 2003 (and, if so, through what date).

27. St. Paul is entitled to a judgment declaring that if a loss occurred after September 16, 2003, for example, on November 21, 2003 or on April 20, 2004 (each of which date ACG has indicated might be the date of its loss under the Bond), St. Paul has no liability for the loss.

## COUNT II

### (Rescission of the Certificate's Extension Based Upon Intentional Or Negligent Non-Disclosure)

28. St. Paul repeats and realleges here, as if set forth at length, paragraphs 1 through 22, 24 and 25 of this Complaint.

29. Assuming ACG were to establish that St. Paul agreed to the Second Extension in March 2004, or the court were otherwise to conclude St. Paul agreed to the Second Extension, the Second Extension would be legally infirm and unenforceable.

30. ACG knew, or in the exercise of reasonable diligence should have known, that the information provided by it to St. Paul in 2004 (in connection with ACG's request for a Second Extension of the Certificate) was incomplete and failed to disclose facts that would be material to a prudent reinsurance underwriter's decision whether to extend the term of the Certificate.

6

31. As a consequence of ACG's intentional or reckless non-disclosure of material facts, which non-disclosure would have induced St. Paul to extend retroactively the term of the Certificate from September 16, 2000 to September 16, 2003, St. Paul is entitled to a judgment rescinding the Certificate's extension and restoring the status quo ante by a return of all premiums and losses paid inter sese in an amount(s) to be established at trial.

## COUNT III

### (Rescission of the Certificate's Extension Based Upon Innocent Non-Disclosure)

32. St. Paul repeats and realleges here, as if set forth at length, paragraphs 1 through 22, 24, 25, and 29 of this Complaint.

33. The custom and practice of the reinsurance industry (including, in particular, the duty of utmost good faith) does not require affirmative misconduct or malfeasance by a cedent in order for a reinsurer to rescind a reinsurance contract based upon non-disclosure of material fact. Likewise, New York law does not require affirmative misconduct or malfeasance.

34. Irrespective of whether ACG acted negligently or with intent to deceive (or to mislead) St. Paul, St. Paul is entitled to a judgment rescinding the Second Extension because ACG failed to disclose to St. Paul all information material to a prudent reinsurer's decisions whether, and on what basis, to renew the Certificate beyond September 16, 2003.

## COUNT IV

### (Date of Loss is Beyond the Reinsured Period)

35. St. Paul repeats and realleges here, as if set forth at length, paragraphs 1 through 22 of this Complaint.

36. Assuming ACG were to establish that St. Paul agreed to the Second Extension, or the Court were otherwise to conclude St. Paul agreed to the Second Extension, and assuming

CPAM: 4730050.2

further the Court were to conclude the Second Extension was valid and enforceable, St. Paul still would have no liability pursuant to the Certificate for any loss under the Bond.

37. The date of loss under the Bond is no earlier than April 2004, meaning the loss occurred after the latest date on which the Certificate expired, i.e., after December 31, 2003.

38. St. Paul is entitled to a judgment declaring that irrespective of whether the Second Extension is valid or not (or enforceable or not) St. Paul has no liability pursuant to the Certificate for any loss sustained by ACG under the Bond. St. Paul is also entitled to a return of any expense payments made by it attendant to any loss or potential loss sustained by ACG under the Bond.

## COUNT V

### (Breach of Warranty of Retention)

39. St. Paul repeats and realleges here, as if set forth at length, paragraphs 1 through 22 of this Complaint.

40. Beginning no later than 2011, St. Paul began to ask ACG to provide St. Paul information concerning the claim made against the Bond. Among the information sought by St. Paul was documentation (or an explanation) demonstrating that ACG had retained net and unreinsured not less than 17.55% of the exposure under the Bond (as ACG had represented it would do).

41. To date, ACG has failed to provide St. Paul either documentation or an explanation establishing that ACG satisfied its retention.

42. If ACG's failure to provide St. Paul the requested information continues through the date trial begins, St. Paul will be entitled to a judgment relieving St. Paul of any liability for any losses that ACG might cede to the Certificate, and to a return of any expense payments St. Paul may have made.

8

**WHEREFORE**, St. Paul respectfully requests judgment:

a. on the first count, declaring that the Certificate expired no later than September 26, 2003 and that St. Paul has no liability for any loss incurred on the Bond on or after September 16, 2003; or, in the alternative,

b. on either the second or third count, rescinding the September 16, 2003 to December 16, 2003 extension of the Certificate and restoring the parties to the status quo ante; or, in the alternative,

c. on either the fourth or fifth count, relieving St. Paul of liability for any losses that have been or that may be ceded to the Certificate, together with a return of any expense payments St. Paul may have made.

In addition, St. Paul requests such other and further relief as to this Court seems just and proper, including, by way of illustration, an award of attorneys' fees and costs (each of which St. Paul believes would be particularly appropriate if the Court finds that ACG intentionally withheld material underwriting information from St. Paul).

Dated: New York, New York
June 12, 2012

|  |  |
|---|---|
|  | CHADBOURNE & PARKE LLP |
|  | By: _____/s/_____ |
|  | John F. Finnegan |
|  | A Member of the Firm |
|  | 30 Rockefeller Plaza |
|  | New York, NY  10112 |
|  | Tel:  (212) 408-5100 |
|  | Fax:  (212) 541-5369 |
|  | jfinnegan@chadbourne.com |
|  | and |
| David M. Raim | 1200 New Hampshire Ave. N.W. |
| Kate McSweeny  (not admitted in NY) | Washington, D.C. 20036 |
| Of Counsel | Tel: (202) 974-5600 |
|  | Fax: (202) 974-5602 |

Attorneys for Plaintiff,
St. Paul Fire & Marine Insurance Company

10